May it please the Court, good morning, my name is Steve Frank from the Justice Department on behalf of the Federal Appellants. This is a Freedom of Information Act case relating to the tragic crash of TWA Flight 800 off Long Island back in 1996. There are 15 records, FOIA records at issue. On the government's appeal, this is a cross appeal, on the government's appeal, we're only appealing one decision of the lower court. And that is the decision that the names of eyewitnesses and FBI agents are not protected from disclosure under FOIA Exemption 6 and 7C. Plaintiff, in his cross appeal, is appealing the decision of the court that four, and there are now just three left, documents are protected under Exemption 5, the deliberative process privilege. I'd like to turn first to... Why are there just three left, just so I'm clear? There were four when we started to brief the case, and the NTSB made a discretionary release of one of those, document number 74. And we advised the court of that in our letter to the court of August the 5th, responding to the court's order to produce the documents in Canada. Well, that one the district court ordered released, right? No, that is one that we actually won on, and Mr. In part. Is that the one where he said release but not the comments or something?  And that's correct, Your Honor. And plaintiff was cross appealing on that one. We released it. But basically you're releasing it all. And so it's out of the case. There are just three deliberative process documents. Turning to the government's appeal, this case is controlled by pretty settled precedent at both the Supreme Court level in the Favish case and by this Court's recent decision in Forest Service. I'd like to turn to Forest Service first because I think it is so directly on point. It's a case in which there was a horrible tragedy, a terrible fire. There were allegations of governmental misconduct. And plaintiff proposed as his public interest the exact same thing that plaintiff proposes here with regard to our appeal and the eyewitness names. In Forest Service, the plaintiff wanted the names of the Forest Service employees who were present at the fire because plaintiff wanted to go out and interview those Forest Service employees to find out what really happened at the fire. In this Court's decision, a very recent decision, it rejected that kind of a direct conduct as a legitimate public interest. And the public interest is precisely the same. The Court, quoting the Court's Forest Service case, it said that plaintiff wanted to contact the employees directly to determine what actually occurred at the fire and to confirm the veracity of the publicly available reports. That is precisely what plaintiff seeks to do here. The Court rejected that. Not only rejected it on the public interest side of the balancing test, but actually added it to the privacy side of the balancing test, finding that going out and finding these people who had undergone traumatic experience of being present at the fire and contacting them and hounding them and not only the plaintiff but the media would invade their privacy. And that's exactly the same situation we have here with eyewitnesses. On the videotape that was submitted that was the CIA depiction of the analysis of the witnesses. Were those the actual witnesses who were appearing in that videotape? That's a good question. I never had no one has ever asked me that. I don't believe that they were. Perhaps you could ask. You think it was a total simulation? Yeah. Yes. You could ask Mr. Clark. I don't think that they were. I'm almost certain they weren't, but I don't want to say that. Almost certain that they were not. And the whole thing was make-believe? I mean, I understood that the physical things were make-believe, but the people weren't make-believe. I'm sorry? The people weren't make-believe. I just don't want to say one way or another, but they were not identified. But it's kind of relevant, actually, because if you previously disclosed their pictures and their names in a video that was on 60 Minutes, what's the privacy interest? I understand your question. So you should really answer it. I will answer assuming that they were. Okay? Okay. First of all, they were not identified by name. Second of all, we do not know if the people in the video were the same people whose names are being protected here. In other words, Mr. Clark and plaintiffs seem to think that all 755 witnesses' names are at stake here. And this is one of the things I want to draw the Court's attention to. I imagine Mr. Clark will talk in broad terms about this crash and about government irregularity. But what I would like the Court to focus in on is the actual documents at issue. The actual documents at issue are CIA analysis of FBI summaries of the witness statements. And in those 12 documents, there are maybe half a dozen, two dozen at most, names mentioned. Okay? I don't really ‑‑ I can't really tell you whether those names match up with the people in the video, because there are no names mentioned of the people in the video. I can also point out, Judge Brewer, if those people who are in the video don't object to their names being released because they voluntarily participated in the video and must have known that their picture was going to be out there, they can certainly advise the government of that. Like I said, we don't know whether they are among the names that we are withholding. If they advise the government that they have no objection to the release of their names because it's already been broadcast, we will release those names. What we are up here today is to protect the names of people who did not come willingly forward. Where ‑‑ if this particular document only has 6 to 12 names, where are the other 720 names or whatever? I'm sorry. Are they in some document? Are the names ‑‑ is there a document that has more than one document that has a large number of names of witnesses? The documents that are at issue are set forth in page 11 of our opening brief, note 3. And also they are described at length in the district court opinion, page 579, 84, 618 to 24. And, for example, in our record excerpts, if Your Honor just wants to take a quick look at pages, I believe it's 508, 513, something like that. That's a good example. And what it is, it's a CIA analysis, and in it, it has name of X. X saw ‑‑ But you're saying there are very few of them. That there are in the documents that are at stake here in this case. That's correct. You're saying there's a total of 6 to 12 witness names appearing in any of the documents at stake. Is that what you're saying? I have not counted them up. I can't count them up. But a number of that order. Yeah. I'm just trying to make the point that they're not 700, all the names are not at stake. It's just the names in these documents. But are we talking about an order difference between 10 on the one hand and 750 on the other? Yes. We're taking ‑‑ We're talking an order difference of 25 versus 755. Yes, that's correct. And that's the point, is that there's a strong privacy interest at stake here. These people did not come forward. The district court committed an error of law by imposing an evidentiary burden on the government to go out and seek their permission. No court has ever ordered that. It makes a fair amount of sense, though, doesn't it, for the reason you just said? Well, it makes more sense because there's less at stake. But we know that if Planoff were to win here, he's then going to go after all 755 of them. And it's very important. And this is ‑‑ The video said there was 243 and that they talked to each one and pinpointed them against the data from the radar so that they could measure distance from or where exactly they were when they saw the light and what they heard and measure the distance for each one. So that sounds like a pretty discrete universe of people. Well, I mean, there is a discrete universe of ‑‑ there's the 700-odd people who were interviewed. But, again, I'm ‑‑ But I'm talking about the ones in the videotape. Well, the ones in the videotape, yeah, it could be a couple of hundred. But if Your Honor's point is going to why ‑‑ is it going to why we don't go out and ask the permission of these people at that ‑‑ Well, if you know who they are and the concern is their privacy. Right. This is a very important point because these kind of cases come up all the time. There's not a single instance, not a single hint in any court of appeals or Supreme Court case that the government has any kind of an evidentiary burden to go out and ask these people. In a FOIA contest. In a FOIA contest. Because the plaintiffs could always put an advertisement in New York and ask the witnesses to come forward. Absolutely, absolutely. Even when there's one or two or three people, no court, the Supreme Court in all of its FOIA cases, has never even suggested that. No court of appeals has even suggested that. Has anybody ever discussed it? Has ever? It's ‑‑ I can't recall off the top of my head. It's such a novel idea and it would impose such a burden upon the government to do that. The Supreme Court FLRA case, I mean, one of the points that was relied upon is the fact that these people affirmatively did want their addresses given out. Well, that was that they just happened to withhold their names from the union. It wasn't any kind of imposition upon the government. The government is here, we're the good guy in this case. This was a tragic crash. Plaintiff, I would imagine, as he did in his brief, is going to broaden the argument for this case. What is not before this case, it is not what caused this crash. That's not. What is before this court is simply whether or not FOIA law, settled FOIA law, protects these names. And not only is FOIA service directly on point, but Favish, and I'd like to turn just quickly to that, because as always in these arguments, my time is just running through. What's important is if plaintiff stands up here, and I'm not anticipating, I read his brief, goes on and on about all of the alleged government improprieties that were committed. Here's the critical point. Favish says there has to be a direct nexus between the alleged government impropriety and the documents being withheld. Then Judge Ginsburg, now Justice Ginsburg, said the same thing in the Commonwealth of Puerto Rico case. With all of plaintiff's scattershot claims of government impropriety, he makes no claim of government impropriety with regard to these documents. No claim that government, the FBI or the CIA, doctored or in any way misrepresented the statements of these eyewitnesses. Ginsburg. Back up for a minute. Does it matter for purposes of this privacy exemption, which privacy exemption we're talking about? It does. And that's why this case is actually a stronger case than FOIA service. FOIA service, first of all, involved government employees who arguably have less of a privacy interest than private individuals. This case, although it does involve a few FBI agents, mostly involved private individuals. And this case goes under both Exemption 6 and 7c. 7c, which is involved with law enforcement records, actually is a stronger exemption. The courts have made that clear. We pointed that out in our brief. So actually, this is a stronger case than FOIA service. And that's because the investigation was handed over for a while to the FBI.  And it involved law enforcement records. But the point I want to make about Favre is that if plaintiff gets up here and starts talking about government impropriety, I would like to know where in the record there is any evidence of government impropriety with regard to these witness statements, not the government allegedly messed with the debris field or this or that. Is that what's required? I mean, in terms of the overall purposes of the statute, which are to demonstrate what the government is doing or whatever the phrase is, why does it matter whether the particular document has or demonstrates government impropriety as opposed to the overall situation if that's what you're alleging? Your Honor, if I leave here having said nothing else, I want to make that point clear because that's the heart of this case. Favre, if the Court will review it, underscores what is called the nexus between the alleged government impropriety and the particular documents being withheld. The Supreme Court requires that. Not only that, I think Judge Ginsburg said it quite well in the Senate of Commonwealth of Puerto Rico where she said a requester must show a public interest in the specific information being withheld. The only allegations of government impropriety with regard to the witness statements is Plaintiff finally got it after we talked about it so much in our briefs, that there had to be this nexus, and he throws in the reports of three of the eyewitnesses. But if you read that, nowhere do those eyewitnesses say the government misrepresented the statements. All those witnesses say is that that CIA ---- Well, the nexuses, I mean, if you want to ---- I mean, whether it's an adequate nexus or not, is that these people know things which ---- and I understand there's a direct, indirect problem, but their portrayal would be we could go to ---- if you gave us their names, we could go to these people, and we could find out that the government has done things that are different than what they say they're doing. That's their theory. Now, Babish is not talking about a nexus between the documents and a broad general claim. There's a broad general claim here of government impropriety, okay, that we removed debris from the missile field, that we did X, we did Y. But what's at stake here is the eyewitness statements. Therefore, the plaintiff has to show some nexus between government impropriety and the eyewitness statements. In other words, he has to show that in some way the government misrepresented or doctored those eyewitness statements. That's Babish, and it's very clear, and it's spelled out in our briefs. And plaintiff nowhere does he show any allegation of impropriety, and that's what I would like the Court to focus in on as a laser. Again, if I might just go over my time here now and say, in his reply brief, he does mention three eyewitnesses, but they don't say in any way that their statements were misrepresented. What they say is that the CIA animation does not show what they saw, and that's true. The CIA rejected any kind of theory, missile theory, and it had its own explanation. But that does not mean that the documents were in any way doctored, and that's the important thing here. If I might have a couple, maybe a minute to reserve. I went on. I'm looking at Babish, and I'm not seeing this very tight connection that you're suggesting. So perhaps when you get up, you can show me what you're saying. It's in our opposition brief at page 33, and all the cases cited therein, and the Senate of Commonwealth of Puerto Rico. Thank you. This is the Court. John Clark on behalf of Captain Layer, who is present. Your Honor, this case is the most controversial disaster in aviation history, and the plaintiff is among others who say that it's the most shocking cover-up in the history of the United States. And we say that it's more so, perhaps more so of a news media scandal than it is a government scandal. In any event, getting to the questions that the government counsel has raised, we talk about the Forest Service case. Well, the Forest Service interviewed the eyewitnesses in that case, and that's not what the eyewitnesses are. The eyewitnesses are secret. They're saying we did interview the eyewitnesses. No. No. With all due respect, Your Honor, the CIA never said that they interviewed a single eyewitness. In fact, they admit the FBI interviewed an eyewitness. Why does that make sense? Well, because the FBI interviewed the eyewitness, and then from those statements, the FBI 302 statements, the CIA summarized the summaries and then used those summaries to make their video animation of what the eyewitnesses said. Now, the government says that the animation is not a report of what the eyewitnesses had seen. I think that couldn't be further from the truth. It is a report of what they said. Well, because we have affidavits in the record of seven eyewitnesses, all of whom repudiate what the CIA animation says, and two of those witnesses definitely were featured. All right. So you have those names, but as to the names of eyewitnesses that you don't have, how do you distinguish our Forest Service employees case? In a number of ways. In addition, primarily because Forest Service said that the release of the employees' identities would not materially contribute to the public's understanding of the event. Also in Forest Service case, none of the names that had been sought were accused of official misconduct, and most that the record does not indicate that any employees have spoken out in the five years since the incident occurred leads us to conclude that such contacts would be unwarranted. However, in this case, we have the exact opposite. We had six eyewitnesses who placed a hold. Right. But we have to separate out the eyewitnesses from the FBI agents for the reason that the FBI agents said anything was improper? I'm sorry, Your Honor. Could you repeat the question? Well, we are trying to distinguish Forest Service employees, and you're saying that none of the employees of the government had spoken out as to something being improper. And my question to you is, have any of the employees of the government here spoken out about something being improper? Yes, a number of them, depending upon how you ---- The FBI agents whose names you want disclosed? No, they have not spoken out about anything having been improper, to my knowledge, the FBI agents' names. Getting back to the Foreign Service case, in the Forest Service, the court, this court, remarked that in the five years since the incident, none of the eyewitnesses had come forward publicly, leaving an indication that they did not want to be contacted. However, in this case, that's completely the opposite. Six eyewitnesses placed a false case. It's pretty odd, though, because the people who came forward, you know about. The people who didn't come forward presumably don't want to be heard because they haven't come forward. So I don't know how that means anything. Well, because the trial court, under the balancing test, said that there is did recognize that there was a privacy interest in these people's identifications, but said that the public interest in ferreting out the truth would be compelling indeed, and that outweighed the privacy interest. What about this alternative, and I think you floated it about sort of getting specific about the privacy interest by asking people. Do you know of any case law supporting that? Does it make sense? No, Your Honor, I'm unaware of anything. Are you proposing that? No, no, and I don't think that the district judge did either. I understand. The district judge just said that the government had not proffered any evidence that the eyewitnesses would not want to be. But you can imagine there being some force behind the notion that because somebody happened to be standing on a beach on Long Island in 1996 and saw something and talked to the FBI, that that shouldn't necessarily expose them to public knowledge about who they are and where they live if they don't want them to be. Well, they're not, it's not, it wasn't, at least according to the government, it's not a criminal investigation. Well, it was a criminal. No, it is according to the government a criminal investigation. It was a criminal investigation. They concluded that there wasn't a crime, but there was a criminal investigation. Well, all of these eyewitnesses also contacted the government. It wasn't the vice versa. The government didn't contact them. How do we know that? It's not in the record, Your Honor, but the government didn't, the FBI conducted no canvassing. And we do know from the eyewitness accounts that we do have that the eyewitnesses contacted the government. I sort of hoped they would have. That's in their affidavit. Right-wing people with that wouldn't come forward, but you think they didn't? I think they did as their duties as good citizens. And I think that they would, and I see no reason why they would not want to be contacted by others to see whether or not, that is private parties, to see whether or not what the government attributed to them was, in fact, what they said, what they told the government. And we know from the evidence that there's, first of all, there's not a single eyewitness that has come forward saying that the CIA's animation depicts what they had said. In fact, we have quite the opposite. Every single one of the witnesses that we've interviewed says that the CIA's animation does not represent what they said in any way. And insofar as the government's knowledge or lack of knowledge as to whether or not these witnesses were featured in the CIA animation, of course they were. Is there any precedent for releasing FOIA? I understand that the whole theory of FOIA data is that it's available to the world, but is there any precedent for releasing it with any kind of protective order or under seal? There is, Your Honor, a great deal of it, and it cannot be done. If it's released to one, it's released to all under the Freedom of Information Act. Insofar as the news media contacting these eyewitnesses, well, we know that based on the news media's history that they're not going to do so. This was in the backyard of the New York Times, and they didn't interview a single eyewitness, and there were hundreds of them. Also, Your Honor, the government talks about the Favich case, and that is, of course, the Supreme Court's most recent pronouncement on this issue. And the Favich case really lowered the bar for disclosure of eyewitness testimony or, excuse me, lowered the bar of information having to do with privacy. And the Supreme Court said that the requester must produce evidence that would warrant a belief by a reasonable person that the alleged government impropriety might have occurred. And the Court went on, the less stringent standard we adopt today is more faithful to the statutory scheme. So I would suggest that the government's characterization of Favich is quite the Your Honor, insofar as the nexus that the government is alleging that the plaintiff needs show, the nexus is between the disclosure and opening up the inner workings of government to public scrutiny. And I think that it's clearly that this is the case. Well, what they actually say in nexus, as far as I could tell in Favich, and that's why I was somewhat surprised by the government's argument, is that we're not deciding that. We might need to consider the nexus required between the requested documents and the reported public interest served by disclosure. We need not do so here. So they didn't do it. So the answer to the question the government's raising really is that Favich didn't decide. Yes, Your Honor. That's correct. So it's an open question, which we may have to decide, i.e., do the particular documents have to relate to the — does it have to be a showing of impropriety as to the particular documents or just on a more general basis? Yes, Your Honor. And insofar as overcoming the plaintiff's burden, of course, the FOIA places the burden on the defendant, the government, to justify its exemptions, with the exception of when the plaintiff is proffering disclosure to show that government impropriety occurred. And in this case, we filed 27 affidavits, 26 of which had to do with government impropriety. And the court, the district court, did a rather good job of summarizing the vast majority. He didn't adopt it, but he said he met the standard, essentially. Yes. Insofar as the government says that the district court did not make any finding as to government impropriety. That is certainly clearly not the case. What the government says, as it notes in its fee order, is that this court explicitly refrained from making a finding, either affirming or repudiating the official government conclusion. The records plaintiff succeeded in establishing a right to — right to obtain do indisputably shed light on that question. So that the district court, as — The Favre standard is warranting belief by a reasonable person the alleged government impropriety might have occurred. That's correct. And, again, all of the allegations, all of the affidavits, all of the facts of the government impropriety remain undisputed in this case. The government could have filed a reinforced affidavit but chose not to do so on any of the many, many points that we show in government impropriety. And that virtually spans the entire investigation. All right. So this would be a real problem in this case, not Favre, but the Forest Service case, with regard to whether the documents themselves — in order to overcome impropriety as the interest, do the documents themselves have to — or the names in the documents have to be relevant to a showing of impropriety or something that you will only get by going outside the documents and using the names. I mean, what you want to do is you want to go interview — you're not claiming that you could tell that the names — putting the names into the summaries that are already there is going to help you know any more about the impropriety or lack of impropriety just by reading it, right? Not entirely correct, Your Honor. Your point is well taken, and that is the case, that we do seek to interview these eyewitnesses. But we're also assuming that we are successful in this case in disclosing these eyewitnesses' names. We would also be successful, I assume, under collateral estoppel of releasing the eyewitness names from the FBI 302 reports. And therefore, we can compare the 302 reports to the summaries that the CIA made of those 302 reports. Are the 302 reports already public? They are public. They were all redacted. The FBI — What's redacted? The names are redacted. The names are redacted. But you have the substance. We have the substance, but we do not have the names. So the FBI gave the NTSB those FBI 302s redacted. The NTSB — But why would you want — I mean, why do the summaries matter if you have the originals? What the — Well, I understand my acquaintance with these documents is not as good as yours. But if you have the original 302 reports, why does it matter what the CIA summaries say? Because the CIA — we think we've pretty clearly shown the CIA has changed and omitted and tweaked its reports. Fine. So you can show that just by looking at the 302 reports and looking at the summaries. If we knew which summary corresponded to the other summary, we could. But I also don't understand why it matters whether the CIA did that. I mean, in terms of your trying to figure out whether there was — what happened here, you know what the 302 reports say. So if the CIA reports are inaccurate, so what? Well, we also have the additional problem of correlating the names on the FBI 302 reports to the names on the CIA reports. And also I would note that — And that is what you're saying, if I can try to be specific, is that for purposes of showing government impropriety, not — if you only wanted to know what happened to this plane, what the CIA — wouldn't matter. But if you wanted to know whether the government — whether there was a government cover-up, I suppose it might matter. Is that what you're saying? Yes, Your Honor. How about the names of the FBI witnesses? What do you seek? What names do you seek? Well, there are, I believe, three names of FBI's supervisory FBI personnel. Supervisory personnel who worked on the reports? On the criminal probe, Your Honor, yes. Three of them, insofar as what that would show. As the district court — But these are not field agents. No, they're not field agents, Your Honor. They're not field agents. There are two agents, we believe, that were accompanied — James Kallstrom, the assistant FBI director. And that's in one of the records. And Mr. Kallstrom's name appears. Two other FBI records — two FBI names are redacted. The other FBI agent is in — apparently, at least according to the district court in-camera review, and also the government's version of this record, appears in record number 28, which was submitted in-camera to this court by plaintiff's motion. Now, I assume that that, too, is a supervisory agent. But, of course, under circumstances, I think it's a safe inference. But I can't say for certain whether that is the case. Your Honor, also, I would like to, since my time is starting to run out, I would like to, at least briefly — You have run out of time. But you can have a couple more minutes. Excuse me? You have run out of time. I have 1.57. Oh, that's over. It's minus 2.02. Oh, Your Honor, may I just make one very brief statement? I would like to suggest that we're seeking the inputs to the time-set simulations. Right. And did the district court rule on that? The district court ruled that the inputs to the time-set simulation of the NTSB were deliberative. We suggest that they are not because they were incorporated into their final conclusion as to the inputs into the NSA. So that's a decision right for us to review? Yes, Your Honor. And the inputs into the other simulation, the NSA simulation, the district court presented it as one record. That is, the simulation and the inputs. His analysis was that that was one record. We suggest that that was incorrect and that the requirement of segregability applies to Exemption 3 cases just as it does in any others. And we have cited cases in support of that in our brief. All right. Thank you, Your Honor. Thank you, counsel. You can have a couple minutes, too. Okay. Just a couple of quick points. I apologize, Your Honor. I looked down at my notes, and I saw government op brief at 33. And I took that to mean opposing, and I saw you looking through it. And I'm sorry for distracting you. That op was opening. Oh, okay. So in the government's opening brief. But I do I have to say quite clearly that we're not deciding that? You know, I'd have to look at that. I don't know the context in which that was said. They may have meant it because dealing with the autopsy photos there, there was just no showing of a nexus with no showing that there was any impropriety with regard to those, so they didn't have to address it because there were no allegations. The important point is the concept of a nexus, Your Honor, between the alleged impropriety and the documents. You know, honestly speaking, your opinion, your brief, now that I've looked at both, is really fairly misleading. Because you say in Favish the Supreme Court emphasized the nexus required between the requested documents and the reported public interest served by disclosure. But it actually said we might need to consider, but we need not do so here.  Well, that is because you have to do it. So it certainly didn't emphasize it. It said we don't know if it matters. Well, no. You have to understand, I believe, in the context, there's a whole line of cases in which this nexus is talked about. It's fairly established FOIA law. And the Supreme Court in Favish was just mentioning that, saying they didn't have to reach it there. But on page 33, we talk about the nexus that they talked about in Favish, but it's also talked about in Ruth Bader Ginsburg's decision in the Puerto Rico case, in Schechter, in just a whole line of cases. I could be wrong. But I don't see any of those which suggest that what you have to demonstrate is that the particular document being sought is itself evidence of impropriety as opposed to that it is or will help in determining the impropriety. In my time left, I can just say take my word for it and have your clerks research it. But I can say this. The other – you see, the reason it makes sense, Your Honor, is that if it's not tied down to the particular document, what you'd have is this case where plaintiff can come in and just make a scattershot allegations of government impropriety, conspiracy theories about all kinds of things. And we'd have to address each and every one of those. Okay. But what I understand that he has said with regard to the witnesses is something along the lines of the following. We have some – the government has put out summaries, reports and summaries of the witnesses' statements. We have some witnesses who have put out declarations saying that their summaries of what they said are not accurate as to what they said. That's not – that's not correct, Your Honor. No? Because he has – and that's the point. If he had any evidence from any witness that said the government mischaracterized my statement, that would be some evidence. But what he has, and this is the critical point, is he has witnesses saying the CIA animation is not what I saw and it's not what I told the agents. But if you go into those statements, you'll see a lot of them that say I saw a missile, I saw something rising up. People said that. What Plaintiff's basically saying is that some witnesses disagreed with the CIA animation and they're totally free to do that. But the conclusion, they disagreed with the conclusion. They disagreed and they're totally free to do that. But that does not mean that we misrepresented their statements. We acknowledged, and the NTSB in its report acknowledged, that there were witnesses who saw something rising up. But the NTSB devoted 100 pages in its report to explaining what they saw. Just because the CIA animation concluded something different from what these witnesses saw and we acknowledged what they said they saw doesn't mean that we misrepresented their statements. That is very, very important. That's the heart of this case. I would like to just conclude by saying that since Favish came out, there have been a whole number of courts of appeals, this is in our opening brief, page 32, footnote 7, that have dealt with whether or not someone has made an evidentiary showing. No court has held that an evidentiary showing has been made, including the Second Circuit in the Wood case. If this Court were to rule that there's no nexus required between the impropriety and the actual document, that would be a very unique, unprecedented ruling. And equally important, if this Court were to rule, were to credit plaintiff's sole goal here. It's not that there's no nexus required. I mean, and I really have no conclusion about this at all. But my question is, obviously, there's a nexus that's required. You have to demonstrate that somehow this document is going to help resolve whatever you say the impropriety is. The question is whether the impropriety has to be about the document. You seem to be saying that they have to demonstrate that the document is doctored or improper in some way, rather than that what you would find out from this document would help you resolve some external impropriety. And what I'm trying to say is not something having to do with moving debris fields or moving this or moving that, but whether it would show that the government misrepresented. It has to be focused in on not look at all the allegations of government impropriety, but focus in on the statement. It would have to show that the government misrepresented the statement. The last sentence is the same. where knowing who the people were would tell you something about whether there was a government impropriety, and without having to go outside and do interviews. I mean, I don't have my hypothetical together twice quite. But, in other words, you seem to be saying that the names can only be revealed if they will help you discover that this document is improper. But why shouldn't the names have to be revealed if the they will help you understand that there is a government impropriety without having to go out and interview people? The document itself, the release of the name, per se, will show you nothing. Well, I'm hypothesizing. It will show you nothing. It would show you something. Like, for example, the person involved, I can't even think of one now, but, you know, is not a properly employed person. Suppose the claim is that the government has people doing jobs they shouldn't be doing. And if you knew who this person was, you would know. It's not to say that you're wrong with the document, but if you knew who this person was, it would be further proof that the government has people doing jobs they shouldn't be doing. If the name itself would disclose something, that would be a different story. In this case, the actual name itself tells you nothing. What you have to do is figure it out. All right, but I'm just trying to get at the rule that you're arguing for. The rule that you're arguing for was that the name had to show that there was something improper about the document. You're now saying that isn't so. The information being withheld has to bear upon what the government is up to. Right. And here, the name itself, just the name, will show nothing about what the government is up to. The only thing that will, arguably, is plaintiffs going out and talking to the government. Right, so you're just making the Forest Service argument. I'm making the Forest Service argument. I'm not here to make new law, Your Honor. I'm not here to make new law. No, I understand. I'm just trying to be specific. You're not really arguing that the nexus has to be that the name will show that the document is improper. I'll expand it. Either the document or that the witnesses' statements were somehow misrepresented. The reason that this is an important case. And the other point is that the court would have to recognize total content. This is, as I said, this is a case about the right to be left alone. And that makes it an important case. Thank you for your patience. Thank you. All right. Lara v. NTSB is submitted. I'll take it. Chang v. Mukasey.
judges: Wardlaw, Berzon, Miner